IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | | |
|---|---|---|
| Joseph A. Cari, Jr., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:18-cv-12217 |
| | § | |
| MedCap Growth Equity, LLC and | § | |
| Christopher Velis, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGES OF SAID COURT:

Plaintiff Joseph A. Cari, Jr. (hereinafter "Cari" or Plaintiff) brings this suit in diversity, asserting claims for breach of contract, breach of fiduciary duty, promissory estoppel, an accounting, and imposition of a constructive trust. Plaintiff would show as follows:

**I.**

**PARTIES, JURISDICTION AND VENUE**

1. Cari is a citizen and resident of New York City, New York.

2. Defendant MedCap Growth Equity, LLC (hereinafter "MedCap") is a Delaware limited liability corporation with its principal place of business in Cambridge, Massachusetts and may be served with process upon its Chairman and CEO, Chris Velis, at 97 Winthrop Street, Cambridge Ma 02138. MedCap is a healthcare venture capital firm specializing in growth capital investments. MedCap seeks to invest in healthcare and advanced medical technology. Defendant Chris Velis ("Velis") is an individual who resides in Boston, Massachusetts and may be served at 97 Winthrop Street, Cambridge Ma 02138. Velis obtained his B.S. degree from the University of Massachusetts, Amherst. In 1992, Velis obtained an M.B.A. degree from Boston

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**                                                         Page 1

University. On his LinkedIn page, Velis lists himself as an Entrepreneur, MedTech Venture Capitalist, and as Founder, Chairman of MedCap from 2005 to the present. His LinkedIn page also says Velis is the General Partner & Founder of MedCap, from March 2015 to the present in Cambridge, Massachusetts USA.

3. Federal diversity jurisdiction exists, and this Court has jurisdiction to hear the merits of Plaintiff's claim under 28 U.S.C. §1332. The amount in controversy exceeds $75,000 exclusive of interest and costs.

4. Venue is proper in the district and division under 28 U.S.C. §1391(b) in that the defendants or their agents, or certain of them, reside or may be found here, a substantial part of the events giving rise to Plaintiff's claims occurred here, and defendants transact business here.

## II.

## FACTUAL BACKGROUND

5. Plaintiff Cari is a male who was born in 1952 and was a managing director and an equity owner in the general partnership of MedCap beginning in October 2015. Cari is a private equity investor, a public policy expert and a philanthropist. Cari obtained his B.A. degree in Sociology, *cum laude*, from the University of Notre Dame in 1974 and his J.D. degree from the University of Notre Dame in 1978. In addition, Mr. Cari was awarded and completed a fellowship at the Institute of Politics at the John F. Kennedy School of Government at Harvard University.

6. Appointed by President William Clinton, Cari has served as chairman of the board of trustees of the Woodrow Wilson Center for International Scholars. Cari also worked with United Nations Ambassador Richard Holbrooke on the issue of U.S. funding of the United

Nations and is currently a member of the Council on Foreign Relations. He serves as Chairman of the advisory board for the Loyola Marymount University Institute of Leadership.

7. Until January 2014, Cari served as chairman and CEO of Integration Capital & Trade, an international merchant bank with offices in New York, London and the Middle East. He has served as a senior partner and member of the executive committee of Ungaretti & Harris, a Chicago-based law firm, and managing director and member of the board of directors of Healthpoint, a New York-based healthcare private equity firm. Cari has also served as chairman of Castellini Partners, a family office with investments in healthcare, medicine and technology.

8. MedCap was formed as a limited liability company pursuant to the Delaware Act by filing a Certificate of Formation with the Secretary of State of the State of Delaware on June 18, 2014, with Defendant Velis as its sole member.

9. In 2016, the Wellman Center of Massachusetts General Hospital ("the Wellman Center"), a Harvard University teaching hospital, chose Cari to serve as the General Partner ("GP") of MedCap. MedCap was originally called MedCap Fundamental, with Fundamental holding a 50% interest, which Fundamental later sold down. The principal consultant and head of development for the Wellman Center, Dr. Lynn Drake ("Dr. Drake"), indicated to Cari that she chose him for the GP position after an introduction by Jack Takas, because he had been to the Kennedy School at Harvard University, was vetted by both Massachusetts General Hospital, the Wellman center and partners Health, and because she knew he had extensive experience in raising capital.

10. Cari's role as GP was to be responsible for the day to day relationship with the Wellman Center, serve on the Board of Directors, recruiting, and fundraising.

11. After Cari was selected for the GP role and accepted the position, he brought in Defendant Velis as a member of its Board of Managers. Along with Velis, Cari was co-founder of Defendant MedCap. Pursuant to the MedCap Growth Equity LLC Amended and Restated Limited Liability Company Agreement (the "Agreement") dated March 22, 2016, Section 2.2(a), the Managers on the Board of Managers of MedCap were initially established at three. Two of the original three members of the Board of Managers were Velis, with 250 units and Plaintiff, with 250 units. As a result of their contributions to MedCap, Defendant Velis and Plaintiff each were provided 35.146875 percent of MedCap Growth Equity GP LP.

12. After Cari began working as GP for MedCap, he received an annual salary and expense reimbursements until the events that give rise to this Complaint. Cari devoted essentially all his time and effort toward the success of MedCap. Cari identified investors and raised funds. Cari brought Velis into the firm. Cari worked diligently as a member of management and a member of the board of directors of MedCap from the time he co-founded MedCap until he was pressured and tricked into giving up his management and board positions in MedCap effective February 16, 2018.

13. On or about Friday, February 9, 2018, Habib Al Assad ("Assad"), a representative of AFAQ (outside consultants from the Middle East), a potential investor in MedCap, telephoned Cari. Assad told Cari that he had an issue regarding Mr. Cari's background. Assad was referring to a plea of guilty Cari had entered at age 52 in 2005 to a felony charge of attempted extortion, an issue that Cari had fully disclosed to Partners Healthcare, Massachusetts General Hospital, the Wellman Center, MedCap and Velis before becoming co-founder of MedCap. Assad told Cari that Mubadala was poised to make a multi-million dollar investment in MedCap and would put the money in, but that it would do so only if and after Cari resigned from management and from

his board position with MedCap. Assad told Cari, "If you resign, they will put the money in. I'm hearing you've got to go. I've already talked to Chris (referring to Velis) about it."

14. Later the same day, February 9, 2018, Cari discussed this phone call from Assad with Velis. Referring to Assad and AFAQ, Velis told Cari, "You resign. We'll get the money."

15. On Wednesday of the next week, February 14, 2018 (Valentine's Day), Velis talked to Cari again about the situation. Cari told Velis, "Let's just do it. I'll benefit from the money coming into MedCap. The fund gets bigger, so my percentage will be worth more.

16. Assad, having flown to Boston from Dubai, Cari, Velis and Assad were in the Med Cap offices in Boston on Wednesday (February 14), Thursday (February 15) and Friday, February 16, 2018. The three had multiple conversations. Velis and Assad said that if Cari would resign from management and from his board position with MedCap, would definitely get an investment for MedCap from Mubadala Investment Company ("Mubadala") an investment company in Abu Dhabi, U.A.E., one of two sovereign funds in Abu Dhabi. Velis and Assad, both in person and on the telephone, told Cari the Mubadala investment would be up to $20 million, but that it would be at least $5 million. Leading up to the final meeting where Cari was presented with a "Term Sheet," these discussions about Cari resigning and Mubadala making the investment occurred as an ongoing dialogue with both Assad and Velis at the MedCap offices. These meetings occurred at the MedCap offices, some just between Velis and Cari, and others between Velis, Assad, and Cari; it was an ongoing dialogue about the concept of Cari resigning and how that would be made acceptable to Cari.

17. The final meeting on February 16, 2018 ("the Term Sheet meeting") where Velis and Assad made these assurances to Cari was at the law office of Brown Rudnick LLP ("Brown Rudnick") in Boston, Massachusetts. Mark Tarallo, a lawyer from the law firm Murtha Cullina,

LLP and a lawyer from the law firm Nixon Peabody, Ms. Kari Harris, were also present at the Term Sheet meeting. Ms. Harris attended as an observer and did not contribute to the conversation. Also present at the Term Sheet meeting were Cari, Velis, Assad, and Catherine ("Katy") Gardner (an attorney for MedCap)("Gardner").

18. At the Term Sheet meeting, Velis and Gardner presented Cari with a term sheet (**Attachment A** – to be FILED UNDER SEAL and/or by agreement or leave of court and incorporated herein by reference) that MedCap and Velis had written as a proposal (hereinafter "the Term Sheet"). Velis and Gardner represented to Cari that MedCap would honor the provisions of the Term Sheet and made other representations. In return for promises in the Term Sheet and in reliance on the terms thereof, Cari signed the Term Sheet and signed a "To Whom it May Concern" statement resigning from all his management and board positions with MedCap and its affiliated entities effective February 16, 2018 ("the resignation memo")(**Attachment B**). The Term Sheet constituted a binding contract. In the Term Sheet the parties demonstrated agreement to the material terms of their bargain. The parties contemplated that they would later execute a more polished version, and this does not affect the enforceability of their contract.

19. At the Term Sheet meeting, before Cari signed the Term Sheet and the resignation memo, Velis stated that MedCap would definitely get an investment from Mubadala if Cari resigned. The representative of AFAQ, Assad, also made this assurance at and before the Term Sheet meeting. Velis and Assad also stated this another way – that Mubadala would come in with up to $20 million, but that if Cari was still in the General Partnership, Mubadala would not come in.

20. The $5 million to $20 million Velis and Assad were referring to at and before the Term Sheet meeting (and before Cari signed the Term Sheet and the resignation memo) was an

investment by Mubadala in the growth equity fund.  Velis and Gardner stated to Cari before he signed the Term Sheet and the resignation memo that if the five million dollars referred to in the Term Sheet did not come in, Cari's equity ownership stayed the same.  The Term Sheet, provided various benefits of substantial value to Cari.  After the Term Sheet was signed and Cari resigned, Velis and Gardner discussed with Cari and agreed that Cari would provide consulting services that included Cari continuing to raise investments into MedCap and the Fund GP.

21. Based on these representations, including the representations that Defendants made to Cari in the Term Sheet, upon which Cari reasonably relied, Cari signed the Term Sheet and the resignation memo.  There was a meeting of the minds between the parties, and Cari understood he had reached an enforceable agreement with MedCap (hereinafter "the Term Sheet agreement").

22. Following the Term Sheet meeting and Cari's signatures on the Term Sheet and the resignation memo, Cari believed, had been told, and understood that he remained an equity owner in MedCap at the existing level if the minimum $5 million investment did not come in and that he had other terms and benefits of substantial value to Cari provided for in the Term Sheet. In the last week of February 2018, Cari went to a fundraising meeting in New York City with Velis.  Also, after the Term Sheet meeting, Velis returned to the Middle East.  Cari and Velis talked by telephone while Cari remained in the United States and Velis was in Abu Dhabi.

23. Also following the Term Sheet meeting, Cari tried to move forward with good faith negotiations to conclude any necessary agreements incorporating the terms set out in the Term Sheet.  Cari mentioned this topic several times to Velis.  Each time Velis replied that he was not ready to do this yet.  Unbeknownst to Cari, Defendants were stringing Cari along, with

no intent to negotiate, let alone to negotiate in good faith to conclude any necessary agreements incorporating the terms set out in the Term Sheet.

24. Following the Term Sheet meeting and Cari's signature on the Term Sheet and the resignation memorandum, Cari, in reliance on the Term Sheet agreement, incurred expenses and undertook efforts to raise funds for MedCap, including efforts to raise a $5 million (or more) investment in the Fund GP – which he understood would be of benefit to MedCap and Cari. Cari spoke with Velis several times, updating Velis on the fact that Cari was speaking with potential buyers. Velis did not say anything to suggest that provisions agreed to in the Term Sheet agreement were not in effect or that Cari would not have the right to attempt to raise capital for the Fund GP or any other MedCap entities.

25. On Monday, April 2, 2018, Velis telephoned Cari. Velis told Cari that Mubadala was not going to make any investment in MedCap. Velis told Cari it was Cari's fault. Cari asked Velis how that could be, and pointed out that he had done what they asked him to do which was to resign. Velis told Cari – "It's all your fault that Mubadala is not coming in. I don't recognize you in the firm. Everything you have touched has been bad. You're a complete failure. I don't recognize your ownership. I don't want to talk to you anymore." Velis was on a rant. The phone call lasted about five minutes, with Cari barely able to get a word in edgewise. Finally, Cari said, "Chris, let's just end the call." Velis was using foul language and being abusive to Cari. On this call, Velis said to Cari, "You're a piece of s___." You f__ked up the whole thing. This is all your fault."

26. When the April 2, 2018 phone call ended, Cari believed the Term Sheet agreement was still in effect, despite the bad news about Mubadala not coming in. Cari understood that he was providing consulting services for MedCap and that both he had a right to

seek to raise a $5 million (or more) investment in the Fund GP – which Cari understood would be of benefit to Cari and MedCap.

27. After the April 2, 2018 phone call with Velis, Cari continued efforts to raise funds for MedCap and for the Fund GP. Cari met with Earl Carr, with Momentum Advisors, who had introduced MedCap to several investors. Cari learned that Starr Company was interested in possibly making an investment, so he met with Earl Carr and Carr's partner, W.M. Platt, at their office in New Your City on Park Avenue. Cari had a good meeting with Carr and Platt. He walked them through the potential investment. He explained that if they invested in the Fund GP, they would get a share of the profits – some of the "carried interest." Cari also explained the option of investing directly in MedCap as opposed to investing in the Fund GP. The meeting ended positively, with Carr and Platt promising Cari they would get back to him, apparently after they talked to Velis.

28. Shortly after meeting with Carr and Platt, at the instruction of Defendants MedCap and Velis, attorney Mark Tarallo sent Cari, through attorney Kari Harris of the Nixon Peabody law firm, a "Cease and Desist" letter dated April 6, 2018 ("the cease and desist letter"). The cease and desist letter stated that after Cari's resignation "from the Management of MedCap Growth Equity Fund (the "Fund"), Mr. Cari had no right to possess or use "the proprietary and confidential information of the Fund, including information regarding its investors and its partners." The cease and desist letter stated, "the Fund demands that your client immediately cease and desist from (1) contacting individuals and entities, including current and/or potential investors and/or current and/or potential partners that were introduced through or during his management of the Fund, and (2) refrain from using or disclosing to anyone the confidential information that belongs to the Fund." The cease and desist letter made other demands,

including a demand that "Mr. Cari must cease and desist operating in any manner that may give the appearance of raising capital for the Fund, and should not engage in any conversations with individuals or entities regarding the Fund or other MedCap entities such that it could be misinterpreted that he continues to be acting on behalf of the Fund and/or MedCap." The cease and desist letter expressly threatened Cari that if he failed to comply with its demands, "the Fund will take any and all legal measures against him as necessary to enforce its rights under state and federal law."

29. The cease and desist letter breached of Term Sheet Agreement. The cease and desist letter made it impossible for Cari to raise any or all of the investments for MedCap and related entities and stripped Cari from the benefits of the bargain agreed to with the Term Sheet Agreement.

30. By means of the cease and desist letter, Defendants effectuated their fraudulent scheme to obtain Cari's resignation from the MedCap board of directors and management and to prevent Cari from realizing the benefits of the Term Sheet Agreement.

31. After Defendants transmitted the cease and desist letter to Cari, Defendants proceeded with the remaining part of their fraudulent scheme with reference to Cari. Not content with stripping from Cari the benefits of the Term Sheet Agreement, Defendants next attempted to pressure Cari to give up his equity interest in MedCap Growth Equity GP LP.

32. On April 11, 2018, Cari, through his counsel, Ethan Trull, a partner in Nixon Peabody, LLP, advised Tarallo in response to the cease and desist letter that Cari was "going to 'stand down,' and would not contact any investors or potential buyers.

33. Since this communication from Trull, Defendants have remained insistent upon the demands in the cease and desist letter. As a consequence of Defendants' scheme, Cari has

lost his management and board position with MedCap and Defendants have taken from Cari the benefits of the Term Sheet Agreement, resulting in damage to Cari in excess of $75,000, exclusive of interest and costs.

34. Since the events leading up to and including the negotiations of an agreement to the Term Sheet Agreement, Defendant Velis has breached his fiduciary duties to Cari as an investor by the following acts and omissions: Velis has damaged and/or ruined the relationship between the Wellman Center and MedCap. Velis has failed to appear for and/or cancelled meetings with Dr. Drake, Patrick Fortune, and Dr. Rox Anderson. In addition, Velis has taken actions that have caused him to be accused of inappropriate advances on a female PhD, researcher associated with Wellman. Velis has failed to make an accounting for his expenses / the expenses he has charged to MedCap and to investors, despite repeated requests by Mr. Cari for such information. Mr. Velis was the sole person who approved and allocated all expenses at MedCap. Mr. Cari had no role in approving or allocating expenses at MedCap. Further, Velis failed to devote his full attention to MedCap, due to his engagement in investment banking activities outside the fund which were specifically precluded in documentation with investors, and on information and belief, Velis has spent MedCap funds on his personal attorney's fees obligations.

35. Defendant Velis, as the sole manager of MedCap and its related entities after Cari's resignation from the management and board of MedCap, had a fiduciary duty to the investors. Velis breached that duty as set forth above, and that breach has caused harm to Cari as an investor in the form of reducing and/or eliminating the value of his equity interest in MedCap.

### III.

### FIRST CAUSE OF ACTION

### Breach of Contract

36. Plaintiff realleges and incorporates the allegations contained in paragraphs 1-33 as if fully stated herein.

37. The Term Sheet Agreement constitutes a valid contract between Cari and Defendants.

38. Defendants' acts and omissions constitute a material breach of the contract, the Term Sheet Agreement.

39. Cari was damaged by the breach of the contract, the Term Sheet Agreement.

40. Cari is entitled to recover as damages the value of all economic losses he has suffered as a result of Defendants breach of contract, for which he now sues.

### IV.

### SECOND CAUSE OF ACTION

### Breach of the Covenant of Good Faith And Fair Dealing

41. Plaintiff re-alleges and incorporates the allegations contained in Paragraphs 1 through 40 as if fully stated herein.

42. Defendants actions as set forth above breached the implied covenant of good faith and fair dealing that is part of the contract, the Term Sheet Agreement.

43. Cari was damaged by the breach of the covenant of good faith and fair dealing in the Term Sheet Agreement.

44. Cari is entitled to recover as damages the value of all economic losses he has suffered as a result of Defendants breach of the covenant of good faith and fair dealing, for which he now sues.

### V.

## THIRD CAUSE OF ACTION

### Fraudulent Misrepresentation

45. Plaintiff incorporates paragraphs 1-40 as if fully set forth herein.

46. Defendants knowingly misrepresented and fraudulently promised (a) that if Cari would resign from management and from his board position with MedCap, MedCap would definitely get an investment for MedCap from Mubadala in the minimum of $5 million and up to $20 million ("the Mubadala Investment"), (b) that they would honor the terms of the Term Sheet Agreement, and (c) that even if AFAQ failed to make the Mubadala Investment, Cari's equity interest in MedCap would remain unaffected (hereinafter "the Promises"). The Promises were false representations of material facts by Defendants.

47. Defendants knew of the falsity of these representations and made them for the purpose of inducing Cari to act.

48. Plaintiff's reliance upon these representations was reasonable under the circumstances.

49. Plaintiff relied upon these false representations and was harmed as a result of his reasonable reliance.

50. Defendants' representations in the promises constituted fraud. Defendants intended or had reason to expect that Cari would rely upon their misrepresentations.

51. The promises were material facts that Plaintiff reasonably relied upon in deciding to act on them by signing the Term Sheet Agreement and the resignation memorandum.

52. At the time that Defendants made the promises, Defendants had no intention of keeping them, but did intend for the Plaintiff to rely upon the promises and did so in order to induce Plaintiff to sign the Term Sheet Agreement and the resignation memorandum.

53. Cari seeks benefit of the bargain damages. Cari seeks benefit of the bargain damages with respect to what should have been provided to him under the Term Sheet as though (a) Defendants had not breached the Term Sheet Agreement, and (b) Defendants had honored all the other terms of the Term Sheet Agreement.

## VI.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

54. Plaintiff re-alleges and incorporates the allegations contained in Paragraphs 1 through 53 as if fully stated herein.

55. By making the representations to Cari on February 14, 15, and 16, 2018, the day of the signing of the Term Sheet Agreement and the resignation memorandum that if Cari would resign from management and from his board position with MedCap, AFAQ would definitely get an investment for MedCap from Mubadala, Defendants were, in the course of their business, supplying false information for the guidance of Cari in his business transactions, causing and resulting in pecuniary loss to Cari by his justifiable reliance on the information.

56. Defendants failed to exercise reasonable care or competence in obtaining or communicating this information to Cari.

57. Cari is entitled to recover from Defendants the amount of his pecuniary losses due to their negligent misrepresentations.

## VII.

## FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty

58. Plaintiff re-alleges and incorporates the allegations contained in Paragraphs 1 through 57 as if fully stated herein.

59. Based on the relationship of the parties, Defendant Velis owed a fiduciary duty to investors in MedCap, including Cari. Defendant Velis breached that duty, as set forth above. There is a causal relationship between that breach and harm to plaintiff.

60. Cari is entitled to recover from Defendants the amount of his pecuniary losses due to the breaches of fiduciary duties by Velis.

## VIII.

## SIXTH CAUSE OF ACTION

### Violation of Massachusetts General Laws chapter 93A

61. Plaintiff re-alleges and incorporates the allegations contained in Paragraphs 1 through 50 as if fully stated herein.

62. Defendants' fraud, negligent misrepresentation, and breach of fiduciary duty (Plaintiff's Third, Fourth and Fifth Causes of Action) are willful violations of Massachusetts General Laws chapter 93A, Section 2(a).

63. Defendants are liable for double or treble damages, attorney's fees and costs under Chapter 93A.

64. Plaintiff has satisfied all jurisdictional prerequisites with respect to his claim under Chapter 93A.

## IX.

## SEVENTH CAUSE OF ACTION

### For an Accounting

65. Plaintiff re-alleges and incorporates the allegations contained in Paragraphs 1 through 64 as if fully stated herein.

66. Defendants failed to properly account for expenses incurred by Defendant Velis and allowed and/or caused MedCap to pay personal expenses of Velis with MedCap funds. Defendants have failed and refused to account to Cari for the expenses that have been charged to MedCap.

67. Plaintiff demands and is entitled to a full accounting from Defendants identifying all expenses charged to and/or paid by MedCap, as well as all items and/or expenses for which Defendant Velis has sought or obtained reimbursement. Mr. Velis was the sole person who approved and allocated all expenses at MedCap. Mr. Cari had no role in approving or allocating expenses at MedCap.

## X.

## JURY DEMAND

Cari hereby makes a demand for a trial by jury on all claims in this action.

## XI.

## PRAYER FOR RELIEF

WHEREFORE, Cari requests that Defendants be summoned to appear and answer and that on final trial, judgment be granted against Defendants and that Cari be awarded the following:

a. All his losses as a result of Defendants' failure to honor The Promises;

b. All his losses as a result of the breach of fiduciary duties by Defendant Velis;

c. The full benefit of Cari's bargain as damages;

d.  Full damages for all Cari's pecuniary losses as a result of the alleged wrongdoing, with double or treble damages as applicable;

e.  Entry of this court's order recognizing and formalizing the constructive trust that exists to his benefit over all assets of MedCap in which he holds an interest pending final resolution of this matter;

f.  Prejudgment and post-judgment interest as allowed by law;

g.  Attorneys' fees and costs of suit; and

h.  Such other and further relief as this Court may deem proper.

Respectfully submitted,

GILLESPIE SANFORD LLP
4925 Greenville Ave., Suite 200
Dallas, Texas 75206
Phone: (214) 800-5111
Fax: (214) 838-0001

/s/ *Hal K. Gillepsie*_____
Hal K. Gillespie
State Bar No. 07925500

/s/ *Paul H. Merry*
Paul H. Merry
B.B.O. No. 343580
Law Offices of Paul H. Merry, Esq.
50 Congress Street  Suite 1000
Boston, MA  02109
617 720 2400
Paul.merry@fairworkplace.net
LOCAL COUNSEL

**ATTORNEYS FOR PLAINTIFF
JOSEPH A. CARI, JR.**